*Summons Iss.*

*SE4 22661*

(left margin handwritten notes)

```
═══ FILED          ═══ ENTERED
═══ LODGED         ═══ RECEIVED

        DEC 17 2008    JS

              AT SEATTLE
         CLERK U.S. DISTRICT COURT
    WESTERN DISTRICT OF WASHINGTON
BY_____DEPUTY
```

08-CV-01812-CMP

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

UNITED STATES OF AMERICA, ex. rel. Geoffrey K. Willson and GEOFFREY K. WILLSON, an individual,

Plaintiffs

v.

ALCATEL-LUCENT, a foreign corporation, and ALCATEL-LUCENT USA INC as successors to Lucent Technologies Inc., a Delaware corporation, and the wholly-owned subsidiaries, LUCENT TECHNOLOGIES WORLD SERVICES INC. and LUCENT TECHNOLOGIES INTERNATIONAL INC.,

Defendants

No. **C08  1812** JCC

**COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.* AND FOR RETALIATORY DISCHARGE and OUTRAGEOUS CONDUCT**

**TO BE FILED UNDER SEAL**

Jury Demanded

COME NOW Plaintiffs 1) United States of America, through Relator Geoffrey K. Willson, and 2) Geoffrey K. Willson, on his own behalf, and for causes of action against defendants Alcatel-Lucent, Alcatel-Lucent USA Inc. and the wholly-owned subsidiaries, Lucent Technologies World Services Inc. and Lucent Technologies International Inc., allege as follows:

## PARTIES, JURISDICTION AND VENUE

1. The United States of America (sometimes referred to herein as the "U.S. Government") is made a named plaintiff herein pursuant to 31 U.S.C. § 3730(b).

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

2.  Geoffrey K. Willson ("Willson") is the Relator herein. He is a resident of Seattle, Washington and this judicial district. Willson was recruited while in Seattle to be employed by Defendants in Iraq.

3.  Relator is an original source of the facts and allegations referenced below in that he has direct and independent knowledge of the information on which these allegations are based.

4.  Defendant Alcatel-Lucent is a Republic of France corporation that, by virtue of a merger effective December 1, 2006, is the successor in interest in all respects to Lucent Technologies Inc., formerly a Delaware corporation qualified and licensed to do business within this judicial district.

5.  On information and belief, Defendant Alcatel-Lucent USA Inc. is a wholly owned subsidiary of Defendant Alcatel-Lucent and is the successor in interest in all respects to Lucent Technologies Inc., and is a Delaware corporation residing in and qualified and licensed to do business within this judicial district. Its registered agent in Washington is Prentice Hall Corp System Inc, at 6500 Harbour Heights Pkwy, Mukilteo, WA 98275.

6.  Defendant Lucent Technologies World Services Inc. ("LTWSI"), located in Greensboro, North Carolina, was a wholly owned subsidiary of Lucent Technologies Inc. at all times material hereto. On information and belief: LTWSI is now a wholly-owned subsidiary of Alcatel-Lucent. LTWSI was created by Lucent Technologies, Inc. as a special purpose entity to address unique initiatives required by the U.S. Government and was used to support the Iraq Reconstruction Effort.

7.  Defendant Lucent Technologies International Inc. ("LTII") was a wholly owned subsidiary of Lucent Technologies Inc. at all times material hereto and, on information and belief, is now a wholly-owned subsidiary of Alcatel-Lucent.

8.  Lucent Technologies Inc. directed and controlled the actions and performance of its wholly-owned subsidiaries LTWSI and LTII and ignored the separate corporate existence of

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

Teller & Associates
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

1 such subsidiaries at all times material hereto and in all respects material to the matters alleged
2 herein.  As a consequence, the separate corporate existence of such subsidiaries should be
3 disregarded for purposes of this action and the acts of LTWSI and LTII should be deemed the
4 acts of Lucent Technologies Inc.

5    9.  Defendants Alcatel-Lucent, and Alcatel-Lucent USA Inc., as the successors in interest to
6 Lucent Technologies Inc., are liable for all the acts of Lucent Technologies Inc. and LTWSI and
7 LTII as alleged herein.  These entities are referred to herein collectively as "Lucent" unless the
8 context requires separate identification.

9    10. This Court has jurisdiction of this matter pursuant to 31 U.S.C. §§ 3730 and 3732 and 28
10 U.S.C. §§ 1331, 1332 and 1345.

11    11. Venue lies in this Court pursuant to 31 U.S.C. §3732 and 28 U.S.C. § 1391 because at
12 least one of the defendants, Alcatel-Lucent USA Inc, resides and transacts business within the
13 district, and because Lucent submitted itself to this jurisdiction when it recruited Relator
14 Willson and hired him from here.

15 **FACTUAL ALLEGATIONS**

16 **A.    Overview of Claims**

17    12. Lucent overcharged the U.S. Government for production of the Iraq Advanced First
18 Responder Network, which was built as part of the U.S. Government's Iraqi Infrastructure
19 Reconstruction Program.  The Contracts in question involve the AFRN, Contract No. W914NS-
20 D-0005 (hereafter "AFRN") and AFRN-I, Contract No. W914NS-05-C-0066 (hereafter
21 "AFRN-I").  AFRN is a Cost-Plus-Award-Fee Contract under FAR 16.405-2, and AFRN-I is a
22 Cost-Plus-Fixed Fee contract.  The overcharging occurred in the following ways alleged in
23 more detail below:

24    a.    **Deceptive Actions for Fee Award Purposes**:  On the AFRN contract Lucent was paid
25       award fee bonuses totaling in excess of $10,000,000.00.  The bonuses were awarded

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

1    periodically based on quality, timeliness and cost-effective management, as reflected in

2    progress and activities as represented by Lucent to the Contract Officers Representative,

3    the Contract Officer and the Award Fee Committee.    Improper and unauthorized

4    activities which were intentionally not cost effective, and increased waste and costs

5    billed to the U.S. Government, were conducted by Lucent to enhance Lucent's revenues

6    at fiscal quarters' end.  Other such activities which gave the appearance of fulfilling the

7    contract were in fact detrimental to the U.S. Government.  Such activities include

8    intentional failure to provide correct export licenses for controlled equipment,

9    intentional refusal to file an insurance claim (the insurance was specifically required to

10   be purchased and premiums paid by the U.S. Government) for damaged equipment,

11   intentional manipulation of successful bids by promising to supply Defense Base Act

12   (DBA) insurance only to select subcontractors and then not providing the DBA

13   insurance, falsely representing that the Small Business requirement of the contract had

14   been satisfied.

15   b.   **Falsification of Test Results and Overcharging for Operations Subcontract:**  Test

16   results were falsified for the express purpose of increasing the timing and amount of

17   Lucent revenues and intentionally hiding ineffective cost management from the U.S.

18   Government.  Some tests were never performed even though required by the contract.

19   As a result of false certification of testing completion, Lucent began Operations and

20   Management ("O&M") payments to a subcontractor amounting to approximately

21   $600,000 per month, and charged the U.S. Government for those payments, including

22   for at least two months before the O&M subcontractor was on site, during which time

23   the system was not operating.

24   c.   **Substitution of Substandard Master Switching Hardware**:    In order to obtain

25   performance bonuses and improve its apparent revenue, Lucent instructed a

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

subcontractor to create a substandard product for installation in the AFRN at an additional cost of $450,000 for the product, plus numerous other related increased costs. This produced a final AFRN which did not meet contract specifications for interconnectivity. To cover up this fraud, Lucent purchased and charged the U.S. Government for additional hardware intended to give the appearance of interconnectivity.

d.  **Price Fixing to Increase Fees:** Lucent engaged in price fixing for a single source contract with a subcontractor, receiving a bid for ten times the subcontractor's engineer's initial estimate of $68,000.

e.  **Hiding Excess Costs which Exceeded Negotiated Limits:** Lucent charged one Contract and Task Order (AFRN TO3) for security work which was actually performed for another contract (AFRN-I), and did so despite assuring the Contracting Officer during negotiations that this would not be done.

f.  **Tax Fraud and Employee Compensation Fraud, with Excess Charged to Government:** Lucent also forced employees to participate in schemes involving "hypothetical" taxation of their incomes and recording of hours which would not be compensated. These schemes had the purpose and effect of increasing the apparent employee compensation costs (from the U.S. Government's perspective) while actually reducing payments to employees, however on information and belief, the U.S. Government was charged as if the full compensation was paid.

13. Lucent illegally involved Willson in a tax fraud scheme (to his detriment and its advantage) having to do with his out of country employment, called the Global Tax Equalization Policy.

14. Lucent terminated Willson's employment in retaliation for his investigation of and opposition to the fraud against the Government referenced herein.

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969   Fax: 860-3172

1    15. These actions were taken intentionally, including the herein-described fraud, and the

2    retaliation against Relator Willson. The intentional misrepresentations alleged herein are false

3    representations of material facts which were made by Lucent representatives with the

4    knowledge and/or intention that the U.S. Government would rely on them, and in fact the U.S.

5    Government did rely on said misrepresentations to its detriment. The misrepresentations

6    alleged herein constitute or were associated with false certifications, statements and claims

7    made to the U.S. Government and for the purpose of obtaining money from the U.S.

8    Government to which Defendants were not entitled. The Defendants, by and through such

9    misrepresentations and false statements and certifications did obtain money from the U.S.

10    Government to which they were not entitled.

11    **B.**    **Background On the Government Contract and Willson's Employment**

12    16. In late 2003 and early 2004, the U.S. Government solicited bids to design, construct,

13    repair and modernize the Iraqi communications system with an Advanced First Responder

14    Network, as part of its overall Iraqi Infrastructure Reconstruction Program. The Advanced First

15    Responder Network was to be an emergency communication system to help coordinate police,

16    security, military, medical, and fire responses. The Advanced First Responder Network

17    contract was for a system designed to cover Baghdad and 15 other Iraqi cities, with

18    interconnectivity between all 15 cities and Baghdad.

19    17. The AFRN project was ultimately broken down into 6 Task Orders ("TO"), broadly

20    defined as follows:

21        a.  TO 1:  Mobilization

22        b.  TO 2:  Theoretical system high level design

23        c.  TO 3:  Admin security for contract infrastructure

24        d.  TO 4:  Specific design of AFRN system from TO 2 concept

25        e.  TO 5:  Design and build of Baghdad facilities

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

f.   TO 6:  Design and build of 15 Iraq cities' facilities

18. The AFRN-I contract (I stands for Integration) was created and negotiated in late 2005 to include items which had been unintentionally omitted from the AFRN (including e.g. refueling of the backup power generators, provision of ACV and other environment controls for installed equipment, database training, SOP development, long distance microwave) and to continue some necessary functions from the AFRN contract (e.g., security items from TO3, and the ongoing operations and maintenance of the new network), since the AFRN contract was to be completed and the contract finalized.

19. In February 2004, Lucent, through LTWSI, submitted its bid for the work.    The Government Customer Team of Lucent, through Lucent Director of Contracting Janet N. Watford, began searching for someone who might act as the Senior Contract Manager for this contract on site in Baghdad, Iraq.

20. On March 23, 2004, Lucent, through LTWSI, was formally awarded the AFRN contract.

21. Lucent recruited and interviewed Relator Geoffrey Willson for the Senior Contract Manager position.   Lucent identified Willson as the Senior Contract Manager in the AFRN contract bid negotiation process with the U.S. Government so that the U.S. Government could agree, and accept him as part of Lucent's proposed key personnel.

22. Even though the AFRN contract was formally awarded to LTWSI, Lucent Technologies Inc. controlled the performance of LTSWI under the contract in all material respects, including the making of all requests, applications and certifications to the U.S. Government with respect to payments to be made under the contract.

**C.    Deceptive Actions for Fee Award Purposes.**

23. Unauthorized activities, which were intentionally not cost effective and increased waste and costs billed to the U.S. Government, were conducted by Lucent to enhance Lucent's revenues at fiscal quarters' end.  Other such activities which gave the appearance of fulfilling

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

the contract were in fact detrimental to the U.S. Government, but increased bottom line profit/loss, or revenues to Lucent.  These include:

24. **Intentional failure to supply a valid UK export license for AFRN equipment:** Because the encryption algorithms were used by NATO, much of the Motorola equipment manufactured in the United Kingdom required export licenses.  The AFRN required Lucent to supply all necessary licenses, and Lucent had informed the US Government and Motorola that export licenses would be obtained to allow the equipment to be transferred into Iraqi ownership. However, Lucent (through Cheryl Hodge) and Motorola conspired to obtain export licenses that were only valid for export to the Department of Defense because these licenses were quicker and easier to obtain.  This allowed faster shipment, which was necessary to manipulate revenue recognition by Lucent for its own benefit.  The U.S. Government was never informed of the insufficient export licenses.  Transfer of the AFRN equipment to the Iraq government violated U.S. law, and created significant costs and waste at the U.S. Government's expense.

25. **Failure to File Insurance Claim:**   In early 2005, the risk of loss for in country equipment became an issue between Lucent and the U.S. Government.  Lucent was specifically directed to provide insurance during shipping to the installation sites, including coverage for war risk.  Lucent purchased such insurance through its shipping carrier and invoiced the U.S. Government for such premiums.  In February, a piece of switching equipment for the AFRN contract was found to be damaged upon delivery in Iraq and was returned to the Motorola factory for a repair, reported at $450,000.00, which on information and belief was charged to the U.S. Government.  Lucent Supply Chain Network refused to file a claim under the required insurance in spite of being urged to do so by the Relator.  By the time the Relator was fired, in December of 2005 no insurance claim had been pursued, and the U.S. Government had not been informed of the situation.  On information and belief, the insurance claim was not submitted so

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

1    that additional repair costs would not be reimbursed, and Lucent's revenues and fees would be

2    increased.

3        26. **Selective provision of DBA insurance skewed subcontractor bids:**   Lucent informed

4    some subcontractors that Lucent would supply Defense Bases Act ("DBA") insurance, as

5    required under 42 U.S.C. §1651, *et seq.*   Subcontractors therefore did not include DBA

6    insurance costs in their bids to Lucent making the bid cheaper and more attractive, and greater

7    bottom line profit (or reduced loss) to Lucent.  One such subcontractor Premise Networks, Inc.

8    ("PNI") had personnel killed and injured by a roadside bomb and was told by Lucent that DBA

9    insurance had not been provided.  DBA is statutorily required and PNI eventually sued Lucent.

10   Lucent misled the US Government about its lack of compliance with the DBA, and the uneven

11   bid process.

12       27. **Improper Small Business Quota:**  During most of 2004 and 2005 Lucent informed the

13   US Government that it was complying with its small business claim quota by hiring personnel

14   from small businesses, however, contracts with these small businesses were not arms length.  In

15   many cases these small businesses were set up by and/or at the direction of Lucent and the

16   personnel hired were provided by Lucent and treated like Lucent employees.  Consequently the

17   U.S. Government was charged for hiring costs and Lucent gained advantages of using small

18   businesses, without any of the U.S. Government's policy requirements being satisfied.

19   **D.     False Certification of Testing.**

20       28. Lucent's AFRN contract with the U.S. Government required that the following tests be

21   performed, each of which triggered payments to Lucent:

22        a.   Factory Acceptance Test ("FAT"): Testing of components at the factory.

23        b.   Site Acceptance Test ("SAT"): Numerous tests run after each subsystem was

24       installed into the AFRN to ensure correct installation. Separate SATs were supposed to be

25       run for each base station, i.e., for the Governate Dispatch Center ("GDC"), Major Switching

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

Offices ("MSO"), Incident Coordination Centers ("ICC") and other local Coordination Centers ("CC") as each was installed.

c. Network Validation Test ("NVT"): Numerous detailed tests were run on the completed Task Order system once most or all functional components were in place. Passing the NVT launched the Operations and Maintenance ("O&M") portion of the contract, with subcontractor Motorola.

d. Operations Readiness Test ("ORT"): Was intended to demonstrate that the methods and procedures were in place to operate and maintain the system.

29. The SAT and the NVT involved the generation of extremely detailed testing protocols, which were required to be signed and witnessed as each item of the protocol was completed.

30. On or about September 9, 2004, Martin Dougherty, Program Director for Lucent's business partner on the AFRN project (Scientia Global, Inc.), reviewed Motorola's suggested tests on the AFRN system, including the Factory Acceptance Test ("FAT"), the Site Acceptance Test ("SAT"), the Operations Readiness Test ("ORT"), and the Network Validation Test ("NVT"). He concluded the proposed tests did not meet the requirements of the contract between Lucent and the U.S. Government. On information and belief, those testing protocol were never updated to meet contract requirements.

### 1) Motivation for the False Testing Certifications

31. In January 2005, Lucent began looking throughout its world operations, including its AFRN project in Iraq, to address revenue shortfalls. This began a series of fraudulent activities by Lucent to improperly realize revenue.

32. On or about January 3, 2005, Edward Eldridge, Program Director for Lucent Technologies Government Solutions division and now Operations Director for the LGS division of Alcatel-Lucent, emailed several others involved in the AFRN project, stating Lucent had a revenue shortfall that quarter that needed to be addressed. On January 11, and January 21,

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

1    2005, David Shaw, Lucent's Manager of Subcontracts in Iraq, noted that $1.545 in revenue

2    projections were tied into completion of SAT and NVT in TO5 by February, 2005.

3    33. On or about February 16, 2005, David Shaw, on Lucent stationary, signed a letter

4    notifying Lucent's subcontractor Motorola that the TO5 portion of the AFRN system was

5    completed and had successfully passed NVT. **This statement was patently false.** TO5 was

6    not completed, and no NVT had occurred.

7    34. The decision to falsify completion and testing certification in order to generate

8    immediate revenues not due and owing was made by David Shaw, Lucent Supply Chain, and

9    Charles Holstein, a subcontractor engaged by Edward Eldridge as the Technical Manager of the

10    AFRN.

11    **2)**     **Result of the False Testing Certifications**

12    35. This false certification triggered the start of Operations and Management ("O&M")

13    payments to Motorola of approximately $600,000 per month. On information and belief,

14    Lucent charged the U.S. Government in part or whole for these payments.

15    36. Because the testing had not actually been completed, it was not possible for Motorola to

16    perform any O&M on the system. For the first two months Motorola was being paid for O&M,

17    the system was not operating because it had been shut down due to security concerns. On

18    March 2, 2005, Chuck Young, Lucent's Supply Chain Manager in Iraq, acknowledged "we are

19    paying Motorola for O&M performance when their teams are not even on site."

20    37. By March 26, 2005, SAT had begun on the TO5 Major Switching Office ("MSO"), but

21    was halted because Lucent had already (falsely) certified that NVT had been completed and

22    SAT was a predecessor to NVT.

23    38. On or about April 14, 2005, Tom Peterson, Lucent's scheduling specialist, sent an email

24    to Andre de Groot, Lucent's Project Control Manager, asking him if he had made progress

25    toward completion of the ECAC spreadsheet for TO6, or whether he was still working on

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

"revenue-related tasks." De Groot emailed back stating he was still working on revenue-related tasks. Peterson forwarded this email to others and expressed his frustration, stating: "We are ostensibly providing project controls, yet the commitments we made to our customer are consistently being overridden by Lucent's internal needs for revenue recognition, or at least the way we manage revenue." He asked for guidance, stating it is clear his management direction over the control group was being overridden.

39. The U.S. Government had created a $9.206 million Award Fee Pool for the AFRN contract. In late April 2005, Lucent was granted payment of 94.8 percent (about $8.75 million) based on alleged good performance. Had the U.S. Government known of Lucent's false certification of testing, it could not have made this discretionary payment from the Award Fee Pool to Lucent under FAR rules.

**3)   Lucent's Admission of False Testing Certification and Financial Motive**

40. On or about May 19, 2005, David Shaw (Lucent's Manager of Subcontracts in Iraq) wrote an email to Scientia's Martin Dougherty admitting he had signed the letter falsely certifying completion of NVT "so I could push the invoices through both Motorola and Lucent's processes."

41. As of May 26, 2005, despite Lucent's certification of test completion and its invoicing of O&M costs to the U.S. Government, neither the SAT, the NVT or the ORT had actually been performed. On information and belief, proper and appropriately documented tests of the system were never performed.

**4)   Lucent Investigation and Cover-up of the False Testing Certifications**

42. On or about May 26, 2005, Relator Willson reported to his superior, Janet Watson, that he had discovered false certification of test completions, and demanded that she take action or he would go to a higher authority as a "whistleblower." Willson also asked for help in formulating an explanation to be sent to the U.S. Government, but never received any reply.

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

43. In late May 2005, in response to emails from Dougherty and Relator Willson exposing the false certification of testing, Lucent purported to conduct an "investigation" of the testing problems. Deceptive practices, revenue manipulation and billing of Lucent Supply Chain Organizations was discussed at board meetings of Lucent. On information and belief, nine other incidents of improper use of U.S. Government money from the Iraq contract were found but were never reported to the contract officer, were never corrected, and the U.S. Government was never informed it was improperly charged for O&M..

44. By late May 2005, Lucent officials were discussing the retroactive signing of test pages that were required to be signed and witnessed at the time such tests were performed. Motorola had proposed some protocols for FAT, SAT, NVT and ORT, but these were rejected by Dougherty as inadequate. By June 2005, Lucent had cut Dougherty 'out of the loop' because he was consistently pointing out issues with inadequate testing, and the failure to actually conduct the tests before certifying the tests as completed.

45. The U.S. Government paid the discretionary fee pool award of approximately $8.75 million based on the high performance rating. Had the U.S. Government known Lucent had falsely certified testing and invoiced the U.S. Government for O&M that was never performed, the U.S. Government would not have granted Lucent the discretionary award fee. A proper investigation would also have demonstrated that Lucent tried to cover up the fraudulent actions and that the Officers and Directors of Lucent knew of the false certifications.

**E.     Substitution of Substandard Computerized Switching Equipment**

46. As alleged above, in January 2005, Lucent began looking throughout its world operations, including its AFRN project in Iraq, to address revenue shortfalls. One idea that was quickly targeted in connection with the AFRN project was to accelerate the ordering and delivery of computerized switching equipment. The manipulations Lucent implemented in both the delivery scheduling and design of the project were done entirely for internal accounting-

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

1  related purposes, without benefit to the U.S. Government and without consideration for whether

2  those manipulations would degrade the quality of the final product.  The U.S. Government

3  made clear on numerous occasions that Lucent was absolutely required to obtain authorization

4  from the Contract Officer ("KO") for any changes in implementation of the AFRN contract.

5      47. In January 2005, Lucent personnel began discussing via email various ways to

6  manipulate the delivery schedule of equipment designated for the AFRN system in order to

7  accelerate revenue realization for that quarter.  It quickly became apparent that the Major

8  Switching Office hardware ("MSO") was a large ticket item (value of approximately $6.2

9  million) but that the Master/Slave configured MSOs could not be produced until at least the

10  following fiscal quarter because "Master" and associated "Slave" units must both remain at the

11  factory until they are programmed together.

12      48. On the other hand, components of a Master/Master configuration could be delivered

13  sooner.  Lucent therefore asked that Motorola substitute a Master/Master MSO, which had the

14  advantage for Lucent of being deliverable in time for Lucent to realize the revenue for the MSO

15  in the second fiscal quarter of 2005.  There was no advantage to the U.S. Government in making

16  the units Master/Master.

17      49. The disadvantages of this unauthorized change suffered by the U.S. Government,

18  included: (a) the new MSO cost $450,000 more than the authorized MSO; (b) substitution of the

19  Master/Master configured MSO would prevent the full integration of the two halves of the

20  AFRN system, as was contemplated in the contract, specified in the design specifications for the

21  system, and agreed to between Lucent and the U.S. Government; (c) certain functions would be

22  eliminated and (d) additional work would be needed for programming, also causing delays.

23  These design changes were not discussed with the U.S. Government or the KO prior to

24  implementation.

25

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969   Fax: 860-3172

50. On February 24, 2005, Lucent formally made a request to Motorola that the Basrah MSO be "upgraded" from Master/Slave to Master/Master. The email exchange regarding this request acknowledged that the U.S. Government had not authorized this change.

51. On November 2 and November 3, 2005, Tony Majeed of Bell Laboratories (who had just come onto the project and therefore was previously unaware of Lucent's manipulations of the MSO configuration) emailed Neil Benn of Motorola indicating Lucent's unilateral decision to reconfigure the Basrah MSO: (a) would require an extensive rebuild of the system and reconfiguration of the two MSOs in order to meet contractual interconnectivity requirements; (b) that he saw no indication the change had been agreed to by the U.S. Government; and (c) the system would not pass NVT or ORT with the current configuration. On information and belief, it will cost many millions of U.S. dollars to rebuild and reconfigure the system in the field to meet contract specifications.

52. On information and belief, Lucent ordered and received through improper channels specialized pieces of equipment (ACU 1000s) to create the appearance of interconnectivity between the two loops of the system, and thus mask the fact that the system was out of specification due to unilateral alterations by Lucent.

**F.     Bid Rigging on GPS Protocol Converter**

53. In August or September of 2005, it was discovered that the GPS information protocol of the hand terminals of the AFRN system were not compatible with those of the Motorola AFRN system. Lucent issued a sole source RFQ to Motorola for a GPS Protocol Converter under Contract No. W914NS-04S-0005.

54. Tony Majeed of Bell Laboratories asked his colleagues at Bell Laboratories for a Rough Order of Magnitude ("ROM") for the converter software. Majeed related to Relator Willson that Bell Labs gave him an ROM of $68,000 for developing a converter. Majeed indicated that when he relayed this to Ed Eldridge, Eldridge told him this was "not enough money."

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969   Fax: 860-3172

55. Subsequently, Lucent sole sourced the converter to Motorola for nearly 10 times this estimated cost. The fact that this was collusion between Lucent and Motorola is evidenced by the fact that Motorola was able to deliver the software within 5 days of being awarded the contract.

56. Relator Willson was fired prior to being able to complete his investigation of this issue.

**G.     Overpayments and fraud in security costs between AFRN and AFRN-I.**

57. While negotiating the AFRN-I follow on sole source contract, Lucent represented that it could not provide adequate security at a low enough cost to be accepted by the U.S. Government unless it was allowed to use assets from AFRN Task Order 6 on the AFRN-I contract (originally TO3 on the AFRN contract) and vice versa. Based on that representation the U.S. Government agreed by letter agreements (signed almost contemporaneously with the AFRN-I) to allow security assets from TO6 to be used on AFRN-I and new assets from AFRN-I (originally TO 3) to be used on TO6. In return, Lucent represented that no further substantial changes would be made to its security arrangements. The U.S. Government specifically required that no substantial changes in the security arrangements could be made (which might reduce the represented costs beyond the expected contract wind-down), and that no security costs would appear elsewhere under different accounting items.

58. However, while agreeing with the U.S. Government to make no changes, Lucent was at the same time requiring the two security subcontractors to re-bid their subcontracts. As a result, Lucent's costs were significantly reduced and the pricing representations to the U.S. Government were known to be inaccurate, and likely false, at the time they were made.

59. The U.S. Government had no need to move AFRN TO3 security into AFRN-I. If they had realized the security costs were so much lower than represented, they would not have allowed the concession. In addition to the Truth in Negotiation Act violation this represents, this resulted in a False Claim in that costs of security under the AFRN contract, with a 3% base

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

1   fee, were shifted to the AFRN-I contract, which has a 7% base fee.  In addition, certain security

2   costs, such as building housing for non-local security guards, were accounted under different

3   items, which was exactly what the Government had forbidden.

4       60. The schedule of work Lucent demanded in the subcontract bid was unusually filled with

5   procedural detail which so favored one of the two subcontractors that only one security of them

6   could fulfill the revised bid.  Relator Willson was informed much later (in 2007) by security

7   contractors involved in the bidding that Lucent rebid the security contract to ensure only one

8   company could win because at least one Lucent-employed person was taking kickbacks

9   (reported to be at least $50,000) from the successful security company.

10  **G.    Willson's Employment Claims Under Contract, and the Tax Fraud Scheme**

11      61. Willson was recruited from Seattle by Lucent.  After hiring him, Lucent unilaterally

12  altered the terms of his employment to his detriment.  Lucent involved Willson in a scheme to

13  defraud the IRS and, on information and belief, falsely inflated the employee compensation

14  costs to the U.S. Government under the AFRN contract.

15          **1. Background of Negotiations and Contracting**

16      62. During the recruitment process, while in his Seattle home and office, Willson discussed

17  the terms of employment with a number of different representatives of Lucent.  These terms

18  included his expected base compensation; an 85% premium on base compensation; Rest and

19  Recreation entitlement; home country travel and repatriation allowances; 401(k) eligibility and

20  matching contributions; life insurance coverage and additional coverage for paid contributions;

21  paid vacation and management days off; health benefits; and other miscellaneous fringe benefits

22  and reimbursements, including bar dues and payment for Continuing Legal Education.

23      63. On May 12, 2004, Lucent sent Willson at his Seattle, Washington address a formal offer

24  of employment as the Contract Administrator-IRP-SMG, Department ID Code 10084732 in

25  Baghdad commencing June 1, 2004.    Willson accepted Lucent's offer based on the

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

1   representations made to him and under the terms of employment that had been specifically

2   negotiated during the course of Lucent's recruitment of him, including the representation that

3   because he would be employed in Iraq he would be paid an eighty-five percent (85%) premium

4   on his base salary.

5       64. Immediately prior to Willson's acceptance of Lucent's offer and during the course of

6   discussions about the formal offer of employment with Lucent, Willson was advised that

7   because he would be stationed in Iraq, there was another component to the employment

8   relationship that included an International Long-Term Assignment Letter ("IA"). Lucent

9   represented to Willson that the IA would specify some of the terms of his employment, but that

10  those terms would be consistent with the representations that had been made to him and the

11  terms of employment that had been specifically negotiated during the course of Lucent's

12  recruitment of him as alleged above.

13      65. On information and belief, Willson *intentionally* was not provided the IA until after he

14  accepted and commenced employment with Lucent.   This was done so that Lucent could

15  conform to its Global Policy for Long Term Assignments.

16      66. Unbeknown to Willson Lucent unilaterally moved the date of employment to May 31,

17  2004 to satisfy its own Global Policy requirements.  On June 10, 2004, Willson finally received

18  his IA.  At the time that Willson received his IA he was scheduled to deploy to Iraq and he

19  understood that Lucent required its immediate execution as a condition to deploying.  Willson

20  executed the IA on June 11, 2004 without having had an adequate opportunity to discuss either

21  its relationship to the representations that had been made to him and the terms of employment

22  that had been specifically negotiated during the course of Lucent's recruitment of him, or to

23  clarify the ambiguities it contained.

24

25

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

### 2. Global Tax Equlization Policy - Background

67. One of the principal inconsistencies between what Lucent had represented to Willson about his employment and how it was treated by Lucent in the IA was the application of Lucent's Global Tax Equalization Policy to Willson's compensation.  At no time during Lucent's recruitment of Willson had it advised him that his compensation would be subject to its Global Tax Equalization Policy.  or of the impact the policy was likely to have on Willson's expected compensation.  (Indeed, at the time of acceptance and after receiving the IA, Willson was not aware there was a Global Tax Equalization Policy.)  At no time during Lucent's recruitment of Willson had it provided him with any written material regarding its Global Tax Equalization Policy.  Lucent's failure to advise Willson concerning its Global Tax Equalization Policy was particularly significant because the source of Willson's compensation was going to be work performed in Iraq and he expected to have tax benefits available to him as a result of his dual nationality and of the foreign income exclusion.  This expectation had been communicated to Lucent (Janet Watford) early in the negotiations.

68. After Willson had an adequate opportunity to review the 2004 IA, he advised Lucent that it was inconsistent with the representations that had been made to him and the terms of employment that had been specifically negotiated during the course of Lucent's recruitment of him. Willson also complained the IA was ambiguous in many respects, including, *inter alia*, the lack of reference to the 85% premium on base salary that he was to receive; the calculation of and conditions for taking promised R&R; and the application of the Global Tax Equalization Policy to him.

69. Lucent was paying Willson through automatic deposits to his Seattle U.S. bank account. Initially Willson was not receiving statements reflecting how Lucent was calculating the actual payments it was depositing.  After finally receiving a few pay statements, Willson was able to determine that Lucent was making unexpected "Hypothetical Tax" deductions from his agreed

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

1    compensation. Willson specifically advised Lucent that he had not agreed to application of the

2    Global Tax Equalization Policy to him and that the withholdings and debt allocations being

3    made by Lucent as a result of applying its Global Tax Equalization Policy were improper and

4    not as negotiated.

5    70. In September 2004, Ernst & Young, Lucent's outsourced administrator for its Global

6    Tax Equalization Policy, recommended to Lucent that it not apply its Global Tax Equalization

7    Policy to Willson.  Apparently Lucent would not accept Ernst & Young's recommendation.

8    Later in 2004, Lucent represented to Willson that it desired to treat Willson as if he were

9    employed by an entity doing business in the U.A.E., where there was no income tax, so that the

10    Global Tax Equalization Policy need not be applied to him.

11    71. In December 2004, as a result of concerns raised by Willson, effective January 1, 2005,

12    Lucent agreed to continue to employ Willson on the following terms: (a) prior to the end of

13    2004 Lucent would make certain tax reporting adjustments to the United States Internal

14    Revenue Service with respect to Willson's compensation for 2004; (b) Willson would be paid

15    from Lucent's United Arab Emirates ("U.A.E.") office, but would continue to be employed in

16    Iraq, not the U.A.E., in 2005; (c) Willson would receive a base salary increase from $100,000 to

17    $130,000 per year payable monthly; (d) Willson would be paid a "retention" bonus of  $30,000

18    in two $15,000 installments; (e) Lucent would provide Willson either "home country benefits"

19    or benefits "comparable" to what he would receive at home, i.e., the United States; and (f) the

20    language of his IA, including the language, *inter alia*, about the 35% overtime premium, the

21    hardship and hazardous premiums, and the R &R policy, would be clarified or modified to

22    reflect the representations that had been made to him and the terms of employment that had

23    been specifically negotiated during the course of Lucent's recruitment of him.  These

24    agreements were negotiated between Willson and James Cocito, who was based in the United

25    States. Mr. Cocito was a supervisor at least two levels above Janet Watford, who was Willson's

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

1   direct report at Lucent. The change in employment was entirely for Lucent's benefit and was

2   intended to be without any change in actual employment or job description with the same

3   benefits, except there would be no application of the Global Tax equalization Policy.

4   72. To implement the agreement that Willson need not be included in the Global Tax

5   Equalization Policy, Lucent required Willson to execute a Local Hire Management and

6   Professional Contract of Employment with the Abu Dhabi U.A.E. office of LTII (the

7   "Employment Contract").

8   73. Even though Willson was a resident of the State of Washington when recruited and

9   employed by Lucent to work in Baghdad, Lucent insisted on including a provision in the

10   Employment Contract providing for disputes arising out of Willson's employment with Lucent

11   be settled according to U.A.E. laws and requiring any actions to be exclusively brought in the

12   courts of the U.A.E. Through Watford, Willson tried to have this provision modified or

13   removed. He was ultimately promised that although it would not be modified or removed in the

14   writing, it would not be enforced against him.

15   74. The choice of forum provision of the Employment Contract, which Willson did not

16   agree to, is unfair, unreasonable, substantively and procedurally unconscionable and

17   unenforceable. It was signed under protest during a time of high stress and great danger, while

18   Government personnel were dying in Iraq and Lucent's personnel regularly came under attack.

19   75. In reality, Lucent at all times intended to apply its Global Tax Equalization Scheme to

20   Willson. Lucent thus misrepresented material facts to Willson and insisted upon conditions that

21   were unfair and unreasonable to pursue its own improper and revenue-producing Global Tax

22   Equalization Policy scheme.

23   **3. Payments Not Made but Owing**

24   76. Lucent then required Willson to sign a new International Agreement ("IA"), dated

25   December 22, 2004. Said agreement was to expire on May 31, 2005, at which time Willson

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

was entitled to receive a $10,000 "repatriation" payment as provided in the IA.  On May 27, 2005 Lucent sent an IA "extension" letter to Willson for execution.  In proposing an IA "extension," Lucent took the position that the agreed $10,000 "repatriation" payment was not yet due.

77. Willson objected to the terms of the proposed IA "extension," and on July 20, 2005, Lucent (represented by James Cocito) and Willson agreed that: (a) the $10,000 "repatriation" allowance would not be paid immediately, but that the $10,000 payment would be made immediately whenever Willson left the Iraq program (provided that he was not dismissed as the result of a criminal or dishonest act); (b) the second installment of Willson's "retention" bonus under the Employment Contract in the amount of $15,000, which was due December 31, 2005 "provided he was still employed by Lucent Technologies," would be paid even if he was no longer employed by Lucent Technologies on December 31, 2005 if his employment was terminated as the result of "business conditions;" and (c) issues related to time reporting and quantifying "comparable Home Country" benefits were reserved for discussion at a later time.

78. After this agreement was reached, the Abu Dhabi U.A.E. office of LTII sent Willson a July 22, 2005 letter threatening to terminate him if he did not sign and return the May 27, 2005 IA "extension" no later than July 25, 2005.  The July 22, 2005 letter also stated that any agreements that Willson had with Lucent that previously "deviated" from Lucent's policies would not be honored. Willson registered his vehement objection to the content of this letter, but because Lucent demanded that the document be executed as a condition of being paid, Willson returned it on July 24, 2005, having added provisions to the text that reflected the substance of the agreements that had been reached as set forth above.  Lucent confirmed receipt and acceptance of the executed May 27, 2005 IA "extension" as amended by Willson.

79. Some of the above referenced compensation is owed but has not been paid to Willson.

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

### 4. Global Tax Equalization Scheme – Fraud Against the Government

80. Lucent imposed upon all its employees who were working oversees the Lucent "Global Tax Equalization Policy." Under this policy, Lucent retained a portion of the employees' wages as a "hypothetical tax" without paying these withheld wages to any taxing authority. These hypothetical taxes were not returned to the employee at the end of the year, but rather, were manipulated together with Lucent taxes and a much lower amount of taxes were paid to U.S. taxing authorities than was actually withheld by Lucent as a "hypothetical tax." Consequently, Lucent revenue was increased on a timing basis; and, since a significant portion of this "hypothetical tax" was retained by Lucent and never paid to the employee or U.S. taxing authorities, the amount of Lucent revenue was increased.

81. Lucent also failed to pay Washington State Unemployment Contributions at least for 2004.

82. On information and belief, **Lucent invoiced the U.S. Government for the full amount of wages represented to be paid, but not actually paid, to employees (not taking into account amounts withheld as "hypothetical tax.")** This represented a false certification of payments paid to employees.

83. In addition, employees were required to record on time sheets 60 hours of work per week but were paid for only 54 hours per week. On information and belief, **Lucent invoiced the U.S. Government for the full 60 hours per week recorded by employees, thus representing an additional false certification of employee costs invoiced the U.S. Government.** Further, although hours recorded by employees over 60 hours per week were not paid by Lucent, the total number of hours was used to calculate average hourly labor costs for U.S. U.S. Government.

84. Because Willson objected to the Global Tax Equalization Policy from the beginning and could not make Lucent change its policy, and Lucent misrepresented its application of the

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

1  Global Tax Equalization Policy to Willson, Willson was retaliated against by Lucent during his

2  employment and thereafter, and suffered monetary losses.

3  **H.     Retaliatory Termination of Willson**

4  85. As Senior Contract Manager, Willson was the official communication contact with the

5  Government concerning LTII's contracts. During the course of Willson's employment, he

6  became aware of various events, conduct and Lucent activities under the AFRN and AFRN-I

7  contracts that he brought to the attention of his supervisors because he believed they were

8  improper and illegal.

9  86. Specifically, over the course of his employment with Lucent, he raised issues related to

10  the following, among others: (a) the improper official certification by Lucent of system test

11  completion under Contract No. W914NS-04S-0005; (b) the false representations to the U.S.

12  Government regarding costs, pricing and security activities (later billed to AFRN TO3) during

13  contract negotiation for the AFRN-I Contract No. W914NS-05-C-0066; (c) bid rigging in

14  conjunction with defective pricing on the sole source RFQ to Motorola for a GPS Protocol

15  Converter under Contract No. W914NS-04S-0005; and (d) application of the Global Tax

16  Equalization Policy.

17  87. Lucent terminated Willson's employment by notice dated December 20, 2005.   The

18  requirement for thirty (30) days notice made the termination effective January 19, 2006.

19  Lucent's stated reason for terminating Willson was false.

20  88. In reality, Willson's termination was substantially motivated by Lucent's desire to

21  prevent him from reporting Lucent's improper activities to the U.S. Government if Lucent did

22  not voluntarily do so; to prevent Willson from further investigating the improper activities as

23  required by his job; and in retaliation for his investigation and intention to pursue this FCA

24  claim.

25

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

1    89. Prior to the final termination notice, Lucent falsely alleged other bases for Willson's

2    termination, including constructing a contrived situation to entrap Willson in an incident of

3    insubordination; and falsely accused Willson of impropriety and misrepresentation.

4    90. Finally, Lucent took intentional action which left Willson stranded on his return to Iraq

5    from R&R without payment of living expenses or travel expenses.

6    91. The termination notice stated that Willson would be paid for thirty (30) days in lieu of

7    notice, but stated that the pay would not include the 85% premium on his base compensation.

8    The notice also stated that Willson was ineligible for the "retention" payment of $15,000 that

9    was specified in his Contract of Employment signed on January 25, 2005 and the May 27, 2005

10   IA "extension" of $10,000 as amended by Willson and accepted by Lucent, notwithstanding

11   that the termination notice specified a business condition as the reason for the termination.

12                                          **CLAIMS**

13          **I.    Claims of Plaintiff United States of America Ex Rel. Willson**

14   I.1   The actions of Lucent (including its agents and employees) as alleged herein constitute

15         violations of 31 U.S.C. § 3729 *et seq.*, as well as violations of the Truth in Negotiations

16         Act, 10 U.S.C. § 2306a and 41 U.S.C. § 254b.  Defendants named Alcatel-Lucent are

17         liable as successor in interest.

18   I.2   The United States of America has been damaged by the actions of Lucent in violation of

19         31 U.S.C. § 3729 *et seq.* and 10 U.S.C. § 2306a and 41 U.S.C. § 254b in an amount to

20         be proven at trial, which damages include, but are not limited to, the following:

21   a.    The unearned $8.75 million Award Fee, which was obtained through false certifications,

22         plus interest.

23   b.    The O&M payments of $600,000 per month, plus interest.

24   c.    The difference between the $68,000 bid for the GPS converter and the nearly $600,000

25         paid to Motorola on a sole source bid under the AFRN-I, plus interest.

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

d.  The Master/Master MSO fraud, and associated $450,000 price increase, plus the diminution in value of the AFRN system, increased costs to cover up the MSO fraud, increased costs to make the AFRN system functional despite the MSO fraud, and other additional foreseeable damages (such as replacing or upgrading the system) and costs of said fraud, plus interest.

e.  The difference between amounts invoiced for employee salaries and amounts actually paid to employees (including all amounts deducted as "hypothetical tax" under Lucent's Global Tax Equalization Policy, but not paid over to U.S. Taxing Authorities), plus interest.

f.  The increased costs of AFRN TO3 which contradicted the representations to the U.S. Government regarding costs, pricing and security activities pursuant to the AFRN-I Contract No. W914NS-05-C-0066, and the Truth in Negotiations violations referenced above;

g.  The foreseeable or actual results of other frauds referenced above.

## II.  Wrongful Termination Claims of Plaintiff Willson Individually

II.1  Lucent terminated Willson's employment as a result of his lawful acts of raising and investigating allegations of conduct by Lucent in violation of 31 U.S.C. § 31 U.S.C. § 3729 *et seq.*

II.2  Lucent's acts as alleged herein constitute violations of 31 U.S.C. § 3730(h), under which Willson is entitled to "all relief necessary to make [him] whole," to include back pay, two times the amount of back pay, litigation costs, and attorney fees.

II.3  The foregoing facts also constitute a wrongful discharge in violation of public policy under the laws of the State of Washington.

II.4  Willson has been financially, emotionally, and otherwise damaged by the above referenced acts in an amount to be proven at trial.

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

1

### III. Other Employment Claims of Plaintiff Willson Individually

2   III.1   Lucent recruited Willson for the purpose of working in Iraq.  Lucent agreed to pay

3   Willson 185% of base compensation if he worked in Iraq.  Lucent also agreed to make

4   specific "retention," "end of service" and "repatriation" payments to Willson, to provide

5   him either "home country benefits" or benefits "comparable" to what he would receive

6   at home, i.e., the United States (including, *inter alia*, 401(k) eligibility and employer

7   matching, insurance coverage, vacation, and health benefits), and to reimburse certain

8   expenses.  Lucent did not pay Willson all that it agreed to pay him and did not provide

9   the benefits it agreed to provide him under the terms of its agreements with him.

10   III.2   When Lucent terminated Willson, it conditioned payment of wages admittedly due and

11   owing Willson, on his execution of a general release of Lucent from any liability arising

12   out of his employment.  Willson did not execute such a general release and Lucent has

13   failed to pay Willson wages it was admittedly obligated to pay.

14   III.3   When Lucent recruited Willson it represented that it would pay him an 85% premium in

15   addition to his agreed base compensation for working in Iraq.  Willson accepted

16   employment with Lucent based on that representation.  However, Lucent imposed the

17   additional requirement that he work and account for 14 hours per week in addition to a

18   normal 40 hour work week as a condition to receiving 35% of the 85% premium; Lucent

19   further imposed the requirement that a 10 hour day 6 days a week (Friday being the only

20   day off) had to be worked and recorded.  Willson was entitled to receive the entire 85%

21   premium without working additional hours.  Willson did in fact work and account for at

22   least 20 hours overtime per week (including the 14 hours per week in addition to a

23   normal 40-hour workweek) except when he was on R&R and those actual overtime

24   hours constitute overtime for which Lucent is obligated to pay Willson. The actual hours

25   recorded by employees working on the AFRN and AFRN-I were used to statistically

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

show the U.S. Government the value of the contract and demonstrate a lower average
labor rate than was actually occurring.

III.4   Lucent's withholding of wages it was admittedly obligated to pay was willful as that
term is defined under RCW 49.52.050 and .070.

III.5   Lucent's withholding of wages it owes but has failed to pay was willful as that term is
defined under RCW 49.52.050 and .070.

III.6   Willson satisfactorily performed the duties and responsibilities of his employment
agreements with Lucent.

III.7   Lucent breached its employment agreements with Willson and Lucent's breaches caused
damage to Willson in an amount to be proven at trial.

**IV. Outrageous Conduct Claims of Plaintiff Willson Individually**

IV.1   Lucent's conduct in terminating Willson while he was on R&R outside of Iraq and
leaving him stranded constitutes the tort of Intentional Infliction of Emotional Distress,
and caused substantial distress and damage to Relator Willson in amounts to be proven
at time of trial.

**PRAYER FOR RELIEF**

Wherefore, Relator respectfully requests that the Court enter judgment against
defendants as follows:

**On Behalf of the United States:**

a.   Economic damages in an amount to be proven at time of trial;

b.   Treble damages as provided for in 31 U.S.C. §3729(a);

c.   Civil penalties of not less than $5,500 and as much as $11,000 or more (pending
statutory amendments) be imposed for each and every false claim that defendant presented
to the U.S. and/or its grantees;

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969   Fax: 860-3172

d. All other foreseeable damages including diminution in value of equipment, additional costs charged because of the foregoing fraud, and all other actual damages and costs;

**On Behalf of Relator**

e. Lost wages and benefits of employment, both past and future, lost future earning capacity, and all other available economic damages in amounts to be proven at time of trial;

f. General damages for emotional distress;

g. Unpaid wages, compensation, and benefits of employment or contract as referenced above in amounts to be proven at time of trial;

h. Double damages for willful withholding of wages;

i. Punitive damages, liquidated damages, and other exemplary damages as available under any law, regulation or ordinance which may be applicable to this matter;

j. All other actual damages;

On Behalf of either or both of the Relator or the United States

k. Prejudgment interest;

l. Reasonable attorney fees, costs and expenses which the U.S. Government and/or Willson may have reasonably incurred in bringing and pursuing this case;

m. Such other and further relief as is just, equitable, or proper.

### JURY DEMAND

Plaintiff Relator hereby demands trial by a jury of 12 persons.

DATED this 16th day of December, 2008.

_____
Stephen Teller, WSBA # 23372
Attorneys for Geoffrey K. Willson, as Relator and Individually

COMPLAINT FOR VIOLATION OF THE
FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.
AND FOR RETALIATORY DISCHARGE

**Teller & Associates**
1139 34th Avenue, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172